UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

GALVIN DUDLEY, :
:
                                    Plaintiff,   :     **OPINION & ORDER GRANTING**
          -against-                              :     **MOTION FOR SUMMARY**
                                                 :     **JUDGMENT**
THE CITY OF NEW YORK, THE NEW YORK :
CITY DEPARTMENT OF PARKS AND :        18 Civ. 10015 (AKH)
RECREATION, STEPHANIE THAYER, :
individually, TRINNETTE JAMISON, individually, :
PIA RIVERA, individually, and FLAVEIA HENRY, :
individually                                     :
                                                 :
                                    Defendants.  :
-------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

       Plaintiff Galvin Dudley brings this action against The City of New York, The

New York City Department of Parks and Recreation (the "DPR"), Stephanie Thayer, Trinnette[1]

Jamison, Pia Rivera, and Flaveia Henry ("Defendants"), contending that Defendants retaliated

against him for complaining of racial discrimination by terminating him from his job at the DPR

in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and New York City

Human Rights Law ("NYCHRL").  Now before the Court is Defendants motion for summary

judgment.  For the reasons that follow, the motion is granted and the complaint is dismissed.

### I. Factual Background

       Unless otherwise indicated, my recitation of the tortuous history of this dispute

derives from the parties' statements submitted pursuant to Local Civil Rule 56.1.[2]

---

[1] Defendants' papers suggest that the proper spelling of "Trinnette" is "Trinette."  To avoid any confusion, I refer to "Trinnette" as "Jamison" throughout.

[2] Dudley's statement made pursuant to Rule 56.1 includes both Defendants' stated facts and numbered responses thereto.  As such, I refer to Dudley's Rule 56.1 statement, rather than citing both Dudley's and Defendants' Rule 56.1 statement.  The facts taken as true are, unless otherwise specified, either uncontested or not contravened by admissible evidence.  *See, e.g., Yoselovsky v. Associated Press*, 917 F.Supp.2d 262, 265 (S.D.N.Y. 2013); *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003).

A. Background and 2016 Lawsuit

Dudley was first hired by DPR in June 2013 as a City Seasonal Aide.  Pl. Rule 56.1 Statement, ECF No. 40, at ¶ 1.  In September 2014, DPR appointed Dudley to the title of a City Park Worker ("CPW").  *Id*.  On September 9, 2016, Dudley filed an action in the Southern District of New York, *Galvin Dudley v. City of New York Dep't of Parks & Recreation and City of New York*, No. 16 civ. 7059, alleging that DPR had discriminated and retaliated against him on the basis of race, in violation of Title VII, Section 1981, and NYCHRL.  *Id*. at ¶ 2.

The 2016 lawsuit alleged the following.  Thayer, at the time Dudley's supervisor at DPR, mistreated Dudley by, *inter alia*, accusing him of forging court documents showing that Dudley needed to attend parenting classes, forcing him to work in unsanitary conditions, and not providing him with sufficient time to complete assignments.  *Id.* at ¶ 3.  Dudley then complained about Thayer's behavior, in response to which Jamison,[3] another CPW, called Dudley a "snitch" and had her then-boyfriend threaten to assault him.  *Id*. at ¶ 4.  Later, Dudley was suspended for allegedly harassing Jamison while both were at a public pool, but, in fact, Jamison had harassed *him* at the pool that day.[4]  *Id*. at ¶ 5.  Last, DPR administrators conducted a flawed investigation into Jamison's allegations regarding the supposed pool assault.  *Id*. at ¶ 6.  The 2016 lawsuit focused on conduct alleged to have occurred in late 2014 and 2015.[5]

On or about April 6, 2017, Dudley, the City, and DPR settled the suit.  The parties, all represented by counsel, entered into a settlement agreement (the "2017 Settlement Agreement") wherein the City agreed to pay $17,500 to Dudley in full satisfaction of any claims

---

[3] The record indicates that Ms. Jamison is, like Dudley, black.  *See, e.g.,* Dudley Tr., ECF No. 36-2, at 54:4-5.

[4] The incident at a pool is discussed in detail in section I.B, *infra*.

[5] The full complaint is included as part of Dudley's opposition papers.  *See* 2016 Complaint, ECF No. 45-15.

that could have been raised in that action.  *Id*. at ¶¶ 7-8 (citing 2017 Settlement Agreement, ECF

No. 36-5, at ¶¶ 2-4).  The 2017 Settlement Agreement contained the following General Release:

> I, Galvin Dudley, … in consideration of payment of $17,500.00 in full satisfaction
> of all claims that were or could have been raised in this action[] … do hereby
> waive, release and discharge City of New York … and City of New York
> Department of Parks and Recreation … (together, the "Defendants"), and each of
> their respective successors or assigns and any and all past or present officials,
> employees, representatives and agents of the Defendants, and their successors or
> assigns (collectively, the "Released Parties"), from any and all claims, liabilities
> or causes of action which were or could have been asserted by me against any of
> the Released Parties based upon anything that has happened up to now and
> including the date of [March 27, 2017].

General Release, ECF No. 36-5, at 1.

B. The July 2016 Incident and the DPR Investigations of Dudley

On July 12, 2016, Dudley and Jamison had an altercation.  On that day, Jamison

was at work at a public pool in Brooklyn; Dudley was, at that time, assigned to work in Queens.

*Id*. at ¶ 11.  Dudley and Jamison first met between 2014 and 2015, while both worked as CPWs.

*Id*. at ¶ 12.  At no time then or after was Jamison Dudley's supervisor.  *Id*. at ¶ 13.  Although the

parties disagree as to why, all agree that Jamison and Dudley did not get along.  *See id*. at ¶ 14.

Returning to the events of July 12:  Around 4:00 p.m., Dudley was seen in the

staff office of the public pool by Jamison and two other DPR employees, non-parties Michelle

Lagno and Julia McDaniel, all of whom were also present in the office.  *Id*. at ¶ 15.[6]  The record

---

[6] Dudley denies ever being in the staff office on that day, but in support of this denial cites only his own conclusory testimony, which responds to the question "Did any of that happen?" with respect to the entire July 12 incident, but (a) does not specifically deny being inside the staff office and (b) elsewhere seems to accept the premise that he was inside the office.  *See* Dudley DPR Interview Tr., ECF No. 36-24, at 7-11 (Q: "Okay.  So, the reason why you were brought in here today is because we received an allegation that you were at the pool.  But you were not in a public area.  You were inside the personnel office."  A: "Okay.").  While the record surely contains a number of denials by Dudley that he was inside the office, this testimony is squarely contradicted by not one, but three eye-witnesses (including two with no interest in this action whatsoever) providing sworn testimony that Dudley was in the office.  And on top of that, in his 56.1 Statement, Dudley *admits* that Jamison "asked [him] to leave the office," which of course only makes sense if Dudley was in the office to begin with.  Pl. 56.1 Statement at ¶ 17.  Summary judgment does not require drawing all inferences in nonmovant's favor, just all *reasonable* inferences.  In any event, wherever exactly the altercation took place, does not alter the final result here for the reasons discussed *infra*.

indicates without any contrary evidence that Dudley has a positive relationship with both Lagno and McDaniel. *Id*. at ¶ 16; *see* McDaniel Tr., ECF No. 36-8, at 18:15-17 (describing the events of July 12, noting that McDaniel "saw him, and he saw me and we hug. 'Oh how you doing?' I said, 'Wow, it's been long time since I seen you,' [sic] vice versa and whatnot"); Dudley Tr. at 33 (Q: "And how did you get along with Michelle Lagno?" A: "We cool.").

Jamison then asked Dudley to leave the office. Pl. 56.1 Statement at ¶ 17. According to Jamison, Lagno, and McDaniel: after Jamison asked Dudley to leave, he became angry and called Jamison a "nigger" repeatedly. Both Jamison and McDaniel recalled further that Dudley nudged Jamison on his way out of the office. *See id*. at ¶¶ 18-19; Jamison Tr., ECF No. 36-6, at 28:9-11; Lagno Tr., ECF No. 36-7, at 15:13-19:11; McDaniel Tr. at 18:15-22:25. Dudley denies using this language and, more broadly, denies that the incident took place. Pl. 56.1 Statement at ¶¶ 18-20. Instead, Dudley alleges that although he was at the pool that day, he never harassed, cursed at, or nudged Jamison; rather, after Jamison asked Dudley to leave the area, Dudley immediately complied and left.

That night, Jamison reported her version of the day's events to a DPR manager, Laurence Major, and made a similar report to the NYC Parks Equal Employment Opportunity Office ("EEO")[7] due to the alleged use of racially offensive language. *Id*. at ¶¶ 24-25.

Seeking additional information, Major asked any witnesses to the July 12 incident to write up statements of what they had seen. *Id*. at ¶ 26. On July 14, Lagno and McDaniel each completed responsive witness statements regarding what they had seen. *Id*. at ¶ 29. In Lagno's statement, she attested in relevant part to the following facts:

> On Tuesday July 12th 2016 approximately 4:00pm as I walked into the pool supervisors office … Ms. Jamison asked me to ask Mr. G. Dudley to leave the office. I did in fact ask[] Mr. Dudley to leave, I stated to Mr. Dudley if the

---

[7] EEO is responsible for investigating alleged violations of the City and/or DPR policy, although it does not have the power to discipline employees for any such violations. Pl. 56.1 Statement at ¶ 31.

supervisors asks you to leave then you should have done so.  When Mr. G.
Dudley was leaving he had called Ms. Jamison a "nigger" …

Lagno Witness Statement, ECF No. 36-10, at 1.  And in McDaniel's statement:

On July 12, 2016 around 4pm … Jamison walked into her office and found CPW
Gavin Dudley in the[re] talking to … Julia McDaniel.  [] Jamison asked him to
leave her office.  He then put [] his hand in her face, [and I asked him] do not do
that.  [H]e then proceeded to leave the office then he nudged her and called her a
nig[g]er 3 times.

McDaniel Witness Statement, ECF No. 36-11.

*1. EEO Investigation*

Thereafter, both EEO and the Parks Advocates Office ("PAO")[8] independently
and simultaneously commenced investigations of Jamison's complaint.  *Id*. at ¶ 30.  In short, if
EEO substantiates a violation of its policies after an investigation, it sends an investigative report
to PAO for disciplinary action.  *Id*. at ¶ 33.  EEO assigned an attorney, Saba Jote, to look into the
complaint made by Jamison.  *Id*. at ¶ 37.  In furtherance of Jote's investigation, she received and
reviewed the written statements of Jamison, Lagno, and McDaniel; interviewed Jamison, Lagno,
McDaniel (twice), and Dudley (with another investigator present), and, eventually, on September
9, 2016, memorialized her findings in a memorandum sent to the DPR Commissioner, a Mitchell
Silver (the "Jote Memorandum").  *Id*. at ¶¶ 38-58.  The Jote Memorandum, which totals 8 single-
spaced pages, made, so far as is relevant here, the following factual findings as to Jamison:

On August 1, 2016, EEO interviewed Complainant [(Jamison)]. ….

Complainant has a history with Respondent [(Dudley)] from her work with him at
prior sites.  Specifically, she met Respondent when he used to work at District 14,
and had a good relationship with him until she met him again at District 19.
According to Complainant, at District 19, Respondent was reprimanded for sitting
in a parked city vehicle for an extended period of time instead of performing his
job duties.  Complainant further asserted that, when Respondent was being

---

[8] PAO is responsible for investigation violations of DPR's "Standards of Conduct," and, unlike EEO, is empowered
through its attorneys to recommend disciplinary charges against DPR employees.  *See* Pl. 56.1 Statement at ¶ 32.  If
PAO recommends that a DPR employee be so charged, a separate entity called the "Parks Advocate" must decide
whether or not to actually bring disciplinary charges.  *Id*. at ¶¶ 33-34.

reprimanded, she heard that he used her as a comparator for his behavior, conveying to the same supervisor that Complainant was always caught "slacking on the job" and never received a reprimand. ….  According to Complainant, since then, their relationship was not great and she rarely even greeted him.  She told EEO that they "don't speak" and he does not work with her anymore.  Hence, on July 12, 2016, she was surprised to see him at her worksite near the pool area at Betsy Head around 4:00 p.m.

Complainant explained that on July 12, she noticed Respondent at her site, near the edge of the pool having a conversation with … Julia McDaniel.  According to Complainant, she approached the two and asked Respondent what he was doing at her site.  [] McDaniel, unaware of Complainant's personal history with Respondent, jokingly asserted that Respondent was her "boyfriend" ….  Complainant told EEO that she said "okay whatever" and walked away from [] McDaniel and Respondent.  Around a half an hour later, at 4:30 p.m., Complainant was looking for [] McDaniel and went to her office.  According to Complainant, she entered the office and saw [] McDaniel sitting at her desk, while Respondent was leaning on the desk ….  Complainant asserted that she told Respondent that he needed to leave her office.  According to Complainant, Respondent countered, "This ain't your fucking office …"  Complainant responded, "Okay, like I said you can leave my office."  Complainant told EEO that a visibly upset Respondent approached her, raised his hands, and began posturing aggressively while shouting profanity.  Complainant asserted that he said "nigger this, nigger that." ….  Complainant explained that [] McDaniel then got up and stood between them, facing him and attempting to calm him down.

At this point, according to Complainant, [] Lagno entered the doorway, and stood beside Complainant. ….  Lagno intervened and declared that she was putting him out because, "if a supervisor says you have to leave, then you have to leave."  Allegedly, Respondent then left the office, using the word "nigger" two more times before exiting. ….  Respondent also allegedly nudged Complainant before walking out.

Jote Memorandum, ECF No. 36-17 at 1-2.  As to her findings on Lagno's statement, Jote noted:

On August 1, 2016, EEO interviewed [] Lagno….  Lagno told EEO that she does not know Complainant or Respondent well, however she is familiar with them….  Lagno asserted that she is more familiar with Respondent because he was previously in her district for a year.  From what she recalled, he was a good employee.  [] Lagno told EEO that she recognized Respondent and was surprised by his conduct. ….

On July 12, she recalled that she was upstairs in the office, using the computer.  After she was done using her computer, a little after 4:00 p.m., [] Lagno went downstairs to go to [the pool].  Upon getting to the ground floor of the office building, she noticed Complainant standing outside of the building.  She approached the office, and noticed Respondent and [] McDaniel in the office.

Complainant told her that she was asking Respondent to leave.  [] Lagno noted that Respondent was standing near the door, and talking angrily to [McDaniel] about Complainant.  EEO asked if she heard Respondent use the word "nigger" in the conversation.  [] Lagno confirmed that she heard him use the word once.  She explained that he was disrespectful, but she did not think he was aggressive.  She did not recall him making hand gestures or raising his hands towards Complainant, nor did she recall seeing a nudge.  However, although she did not see a nudge, her back was turned and she may not have had an opportunity to see it.  She did confirm that she felt Complainant nudge her, so according to [] Lagno, it was "possible that [Complainant was pushed by Respondent" and bumped her due to the momentum of his push.

*Id.* at 3.  Next, as to her findings on McDaniel, Jote found as follows:

On August 30, 2016 and September 8, 2016, EEO interviewed [] McDaniel via telephone.  Ms. McDaniel …. Is familiar with Respondent because three years ago she worked with Respondent at a site near to where she lived …. McDaniel met Complainant in summer 2016, when Complainant came to her worksite …. Complainant is not really CSA McDaniel's supervisor because they work different shifts …. McDaniel told EEO that she always had a good impression of Respondent, and that they always laughed and joked, so she was happy to see him when she arrived at her worksite at 4:00 p.m. on July 12, 2016…. McDaniel told EEO she was standing outside of the [pool] office when she first saw him.  He approached her and they hugged and were in the midst of conversation when Complainant approached the two…. According to [] McDaniel, Complainant proceeded to explain why she did not have a good relationship with Respondent, in front of Respondent.  He became visibly agitated.

Around fifteen minutes later, [] McDaniel went to her post in the office at [the pool].  [] McDaniel asserted that, shortly thereafter, Respondent entered the office to talk to her.  After a few minutes, Complainant appeared at the door of the office and asked Respondent to leave.  According to [] McDaniel, Respondent became upset and beg[a]n to walk towards Complainant, cursing and getting angry.  [] McDaniel recalled that she stood up to get in between Respondent and Complainant, and told Respondent "don't do that."  [] McDaniel did not characterize Respondent's behavior as overly aggressive.  She told EEO that she did not see him nudge Complainant on his way out of the office, although he may have brushed past her.  Additionally, she did not recall him waiving his hands in Complainant's face.  However, [] McDaniel told EEO that Respondent called her a "nigger" several times.  [] McDaniel told EEO that she did not want to write a statement, because she "didn't want to get in it."  When asked by EEO why she did not want to "get in it," she elaborated that she did not want to become involved because she is friendly with Respondent.  She always liked Respondent, and she still likes Respondent, but she was surprised by his behavior that day.

*Id.* at 3-4.  Finally, as to Dudley, Jote catalogued the following:

On August 30, 2016,[9] EEO interviewed Respondent…. He knows Complainant from working at different sites, …. [and a]t these sites, they worked together daily. According to Respondent, he and Complainant were never friends, and never had a positive professional or personal relationship. Respondent recalled that in early July, he was at [the pool], because he lives in the area…. Respondent confirmed that he did have a disagreement with Complainant that day, but denied that he was in the [] office. According to Respondent, he was standing in front of the waiting area, talking to another employee whose name he did not recall…. [And] after this, Complainant told him to leave asserting that "I don't want you here." According to Respondent, he voluntarily left…. Respondent told EEO he was never in an office at [the pool] that day. He also stated that he never called Complainant a "nigger" or anything of the like. Respondent told EEO he never put his hands in her face, or acted aggressively towards her….

EEO asked why Complainant would place him in the office and make such allegations against him. Respondent told EEO that Complainant was trying to get him fired. Respondent further explained he feels Complainant has animosity towards him because he filed similar EEO related charges against her best friend in the past. He told EEO that "they are reversing it on him," in reference to Complainant and her friends. EEO asked if there was any reason that anyone else would corroborate that he was in the office, and that he used offensive language. Respondent asked EEO which witnesses corroborated the matter. EEO refused to answer, however Respondent quickly asserted that he knew [] Lagno was likely a corroborating witness. EEO questioned how Respondent knew [] Lagno was a witness, to which he replied he was already interviewed about the same allegations by the Parks Advocates office. Respondent told EEO that he was not sure why [] Lagno would make such allegations against him…

*Id*. at 4.

Based on these interviews, Jote made the following conclusions. First, Jote reasoned that while Jamison had some "apparent motives to fabricate her allegations" and had not discussed Jamison and Dudley initially interacting outside of the office, she was on balance credible given the consistency of her interview with her initial statement, the detail with which she recalled the events in question, and the fact that Lagno and McDaniel both gave statements that largely corroborated Jamison's account. *See id*. at 5. Jote took note of the fact that Jamison

---

[9] I note that Dudley alleges in the Complaint that he "learned for the first time" of Jamison's accusations relating to the July 12, 2016 incident in June 2017. *See* Compl., ECF No. 3, at ¶ 74. Because Dudley was interviewed by Jote in August 2016 as to the incident, and Dudley does not dispute this fact, *see* Pl. 56.1 Statement at ¶ 52, I disregard the Complaint's suggestion of untimely notice.

had remembered Dudley putting his hands in her face, but that the other witness statements did not support this detail. *See id* at 6. Second, Jote found both Lagno and McDaniel credible, given that both had drafted statements only "two days after the incident" and that their interviews both "presented substantially similar narratives." *Id*. Moreover, neither "had any discernible motive to fabricate their allegations," as Lagno had "no real prior relationship with either party" but had a positive impression of Dudley and McDaniel had a positive past relationship with Dudley and similarly "positive feelings about him overall." *Id*. Jote noted in particular that "McDaniel has no motivations to lie on behalf of [Jamison]," as they "do[] not have a relationship." *Id*. Third, Jote found that Dudley "lacked credibility," given that all interviewees but him contradicted his claim to not be inside the pool office; and Dudley's story was "implausible" given that, among other things, he refused to identify McDaniel as the "friend" he was visiting despite their friendly relationship, and he claimed that Jamison asked him to leave just because he was in the public pool area. *Id*. at 6-7. Based upon these credibility findings, Jote concluded that Dudley had in fact called Jamison a "nigger" in the pool office and that this word, being highly offensive, was enough to constitute creation of a hostile work environment. *Id*. at 7 (citing, *inter alia*, *Rivera v. Rochester Genesee Reg'l Transp. Authority*, 743 F.3d 11, 24 (2d Cir. 2014) ("Perhaps no single act can act more quickly to alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger'…"). Accordingly, Jote referred the matter to PAO for disciplinary action. *See id*. at 8.

### 2. PAO Investigation

Meanwhile, PAO conducted its own investigation through Deputy Parks Advocate Jorge Real. Like Jote, Real reviewed the written witness statements from Lagno and McDaniel. Pl. 56.1 Statement at ¶¶ 63-64. Real also received an email, on July 15, 2016, from another DPR worker, Helaine Basher, alleging that Dudley had engaged in other misconduct:

We are having a problem with CPW Dudley [].  Recently he advised/claiming of an injury stemming from a Parks vehicle accident, and has been working with a torn acl, and herniated disc (although I haven't seen any documentation) advised that he is waiting for surgery, and didn't fill out Parks paperwork, and did not advise supervision that he was injured.  He retained a lawyer and filed a workmans comp case, but not thru parks.  Since learning of this, he has been video taping, and recording all employees including supervision.  He has been absorbing huge amounts of supervision time arguing issues, luring and baiting staff into conversations and recording them.

Several of our staff … said they don't want to work with him.  Supervision decided to fix post him, and advised Dudley accordingly.  On Tuesday 7/12 he was to report direct to Jackson pond facility, but instead went to the stops compound (that's where sector has vehicles parked), and continued to record conversations with employees.  A clear act of insubordination. ….

We did not see a call out on 7/13.

On 7/14, he reported to Victory field, not Jackson pond, (again an issue) and asked supervisor for a timecard, and handed a documentation for his absence on 7/13.  The documentation is dated 4/25/16 that he has a court date on 7/13. (issue)

On 7/14, [a supervisor] advised that when he got back to Victory field to distribute paychecks he overheard a verbal altercation between [an employee] and [] Dudley.  When asked what happened they said nothing. ….

I feel he is … pushing for more serious confrontation.

Basher Email, ECF No. 36-23, at 1–2.  Days later, on July 21, Basher submitted to Real several disciplinary forms concerning Dudley's alleged misbehavior, detailing instances that included Dudley failing to show up for assigned work on July 15, 2016; Dudley disregarding instructions to report to a certain work location on July 14, 2016; and a DPR crew chief alleging that while "driving around with Dudley he would put his head out of the vehicle's window and make sexual advances towards patrons" and "Dudley often refused to work after lunch."  Pl. 56.1 Statement at ¶ 67 (citing Real Memorandum, ECF No. 36-14, at 1–2).  Real began to investigate Basher's complaint alongside Jamison's.  *Id.* at ¶ 66.

In connection with his investigation, Real interviewed Jamison, Dudley, and the DPR supervisors who reported the insubordinate and/or inappropriate conduct described *supra*.

*Id*. at ¶¶ 70-74; Real Memorandum at 2-3.  Real summarized the findings of his investigation in a memorandum sent to the Parks Advocate, in which Real credited the allegations that Dudley had called Jamison a "nigger," *id*. at 4 (I "did not find any reason for Jamison, Lagno, and McDaniel to fabricate the accounts of what occurred," when all three "agreed with the version of events") and found Dudley not to be credible, *id*. at 3-4.  As to the latter finding, Real noted that during Dudley's interview, Dudley claimed that "his record at parks was clean and he has not had any issues," but this was contradicted by the fact that Dudley had a documented disciplinary history with DPR, including an instance in which Dudley was caught on video-tape threatening another employee.  *Id*. at 3; *see* Pl. 56.1 Statement at ¶ 79 (agreeing that "Real cited to … substantiated incidents of workplace violence involving [Dudley]").  Real's memorandum was submitted on September 7, 2016, on which date Real's investigation concluded.  *Id*. at ¶ 82.

### 3. The Conclusions of the EEO and PAO Investigations

Starting September 9, 2016, only a few days after Real's investigation ended, Dudley was out of work on medical leave and did not return until June 1, 2017.  *Id*. at ¶ 83.  On June 13, 2017, shortly following Dudley's return, DPR proffered several charges against Dudley for the July 12, 2016 incident and the other misconduct allegations detailed *supra*.[10]  *Id*. at ¶ 84. On June 28, 2017, after an informing hearing, Dudley was found guilty on *all* charges; the DPR official presiding recommended that he be terminated.  *Id*. at ¶ 87.  Dudley appealed the decision and on July 25, 2017, after review by a separate DPR officer, the initial decision was upheld and termination again recommended.  *Id*. at ¶ 89.  Dudley was terminated on July 29.  *Id*. at ¶ 90.

Dudley appealed again, now to the New York City Office of Labor Relations ("NYCOLR").  *Id*. at ¶ 91.  On December 1, 2017, after another hearing, the NYCOLR rejected the appeal, finding DPR's charges substantiated.  *Id*. at ¶ 92.  Again, Dudley appealed, this time

---

[10] Namely, Dudley was charged with "refusing to do work after lunch, disregarding assignments, and refusing to follow orders in violation of [DPR guidelines]."  Pl. 56.1 Statement at ¶ 86.

to a neutral arbitrator.  *Id*. at ¶ 93.  A total of six hearings were held between September 2018 and May 2019, at which Dudley (a) was represented by counsel, (b) had the opportunity to cross-examine all witnesses (but for Real), and (c) submitted extensive post-hearing briefs.  *Id*. at ¶ 94; *see* DPR Dec. I, ECF No. 36-30; DPR Dec. II, ECF No. 36-31; NYCOLR Dec., ECF No. 36-32; Arbitrator Dec., ECF No. 36-12.  On September 20, 2019, the arbitrator affirmed all the charges against Dudley, in a 10-page decision that ultimately concluded that Dudley's actions towards Jamison were proven, "egregious," and cause for termination.  *See* Arbitration Dec. at 9-10.

C. Dudley's Complaints of Discrimination

    Before, during, and after the complaints and proceedings against Dudley were under way, Dudley brought several complaints of his own concerning various DPR employees. *Id*. at ¶ 99.  Between August 2015 and October 2016, Dudley made "at least five" complaints to EEO, PAO and New York City's 311 reporting system.  *Id*.  In one of these complaints,[11] filed in August 2016, Dudley claimed that Jamison had driven to his residence and threatened him.  *Id*. at ¶ 100.  PAO investigated the complaint, interviewed Dudley and Jamison, and concluded that the evidence did not support these claims.  *Id*. at ¶¶ 101-03.  The PAO investigator, Hanice Tavares, noted, *inter alia*, that Dudley had told her that he would arrange to have eyewitnesses contact her office, but no such eyewitnesses ever did, and that Dudley had claimed that a DPR employee by the name of "Lamar Davis" was with him at the time of the incident, but no one by that name is or was employed by DPR.  *Id*. at ¶ 104.  In another of Dudley's complaints, filed October 2016, Dudley claimed that several DPR employees including Jamison, Lagno, and Jote (but omitting any mention of McDaniel) retaliated against him on the basis of his gender and race (as a black man) by substantiating Jamison's complaint against him concerning the July 12, 2016 incident.

---

[11] Dudley alleges that, before filing his complaint with PAO, he brought the incident to the attention of Defendants Flaveia Henry (an employee of the City and DPR, with supervisory authority over Dudley) and Pia Rivera (also an employee of the City and DPR, with supervisory authority over Dudley), but neither followed up on his complaint. *See* Compl., ECF No. 3, at ¶¶ 21-22, 59.

*Id*. at ¶¶ 105-08.  Because this complaint contained allegations of discrimination, it was referred

to the New York City Department of Citywide Administrative Services ("DCAS"), a municipal

agency of the City independent of DPR.  *Id*. at ¶ 108.  DCAS reviewed Dudley's complaints of

discrimination made between August 2015 and October 2016; interviewed, *inter alia*, Dudley,

Jote, and Real; and determined that Dudley's claims of retaliation and discrimination were not

substantiated.  *See id*. at ¶¶ 109-11.  DCAS codified this determination in a letter to Dudley on

July 3, 2017, *see* DCAS Letter (July 3, 2017), ECF No. 36-37, at 1, and a 14-page single-spaced

memorandum detailing its findings, *see* DCAS Memorandum, ECF No. 36-33, at 5 (concluding

that Dudley's "gender discrimination claim appears to rest entirely on [his] speculation that the

female investigators believed the witnesses and him [him] because of their gender," and further

that there was "no evidence supporting [Dudley's contention that DPR] declined to substantiate

the complaint [that Jamison threatened him] because [Dudley] had previously filed complaints

… with the EEO Office.  Rather, it reached its conclusion based on a thorough investigation and

rational analysis of the evidence obtained").

Dudley also filed several complaints outside of DPR's internal process, *e.g.,* with

the N.Y. State Division of Human Rights, none of which found his allegations substantiated.  *See*

Pl. 56.1 Statement at ¶¶ 115-21.  And as discussed in section I.A, *supra*, Dudley ultimately filed

a federal action in September 2016 based upon similar claims of discrimination.

## II. Procedural History

Dudley commenced this lawsuit on October 30, 2018 and filed the operative

amended complaint the next day.  *See* Complaint, ECF No. 1; Amended Complaint ("Compl." or

the "Complaint"), ECF No. 3.  The Complaint brings three related causes of action:  First, that

Defendants retaliated against Dudley in violation of 42 U.SC. § 1981; second, that the City and

DPR retaliated against him in violation of Title VII, 42 U.S.C. § 2000e-3(a) *et seq.*; and finally,

that Defendants retaliated against him in violation of the NYCHRL, *see* N.Y.C. Admin Code

§ 8-107(7).  All three causes of action are based on Dudley's allegation that he was terminated on July 29, 2017 in retaliation for the many complaints of discrimination and retaliation detailed *supra*, which Dudley filed between August 2015 and October 2016.  On January 21, 2020, after discovery had closed, Defendants filed the instant motion for summary judgment.  *See* Def. Mtn., ECF No. 34.  Defendants' motion became fully briefed on June 12, 2020.

Before proceeding, I pause to note that Dudley has, in the course of briefing this motion, abandoned several claims.  In his opposition brief, Dudley expressly declines to respond to Defendants' arguments that (1) DPR may not be sued, and (2) Section 1981 does not provide a private right of action against state actors.  *See* Pl. Opp. Mem., ECF No. 41, at 1 ("Plaintiff only intends in pursuing this matter solely against the City of New York.").  Dudley further states that he only wishes to pursue his claims against the City under Title VII and NYCHRL.  *See id.* ("Plaintiff will also withdraw all causes of action against [the individual Defendants] and the New York City Department of Parks and Recreation.  The only claims that remain are against the City of New York for retaliation in violation of Title VII and NYCHRL.").  As such, all but Dudley's claims under Title VII and NYCHRL against the City are dismissed with prejudice and not addressed further.  *See, e.g., Felske v. Hirschmann*, 10 Civ. 8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them."); *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999) (describing "waiver" as the "litigant's intentional relinquishment of a known right."); *Hobbs v. County of Westchester*, 397 F.3d 133, 147 (2d Cir. 2005) (regarding a "challenge as abandoned" where the party's brief "contain[ed] no argument" on the issue).

## III. Discussion

A. Legal Principles

*1. Standard of Review*

Summary judgment is to be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A court considering a motion for summary judgment "construes the evidence in the light most favorable" to the nonmovant, and "draw[s] all reasonable inferences in its favor." *Niagara Mohawk Power Corp. v. Jones Chemical, Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).  The nonmovant "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Second Circuit has noted that it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases …. [because] the salutary purposes of summary judgment——avoiding protracted, expensive and harassing trials——apply no less to discrimination cases…" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quotation marks and alterations omitted).

### 2. Retaliation under Title VII and NYCHRL

"Title VII forbids an employer to retaliate against an employee for, *inter alia*, complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006); *see also* 42 U.S.C. § 2000e-3.  Retaliation claims under Title VII are analyzed under *McDonnell Douglas*'s familiar burden-shift.  *See, e.g., Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 842 (2d Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  At the first step of *McDonnell Douglas*, the plaintiff must make a *prima facie* case by showing (1) he participated in a protected activity; (2) the defendant knew of the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) there is a "causal connection between the protected activity and the adverse employment action." *Id.* at

844 (quotation marks omitted).  The "Supreme Court [has] held that Title VII retaliation claims must be proved according to traditional principles of but-for causation, which requires that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id*. at 845 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 388 (2013)) (quotation marks omitted).  At the second step of *McDonnell Douglas*, if the employer "articulate[s] a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the *prima facie* case drops from the picture," and the plaintiff "must then [demonstrate that the] non-retaliatory reason is a mere pretext."  *Id*.

Here, Dudley seeks to prove causation under the so-called "Cat's Paw theory of liability."  Pl. Opp. Mem. at 4.  The cat's paw theory "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action."  *Vasquez v. Empress Amb. Serv., Inc.*, 835 F.3d 267, 271-72 (2d Cir. 2016) (quotation marks omitted).  As the supervisor is the employer's agent and has "permitted himself to be used as the conduit of the subordinate's prejudice, … that prejudice may then be imputed to the employer and used to hold the employer liable for employment discrimination."  *Id*. (alterations and quotation marks omitted).  Under the theory, an employer is "liable under Title VII when, through its own negligence, [it] gives effect to the retaliatory intent of one of its … employees."  *Id*. at 273-74.  In *Vasquez*, for example, the Second Circuit found at the Rule 12(b)(6) stage that the plaintiff had adequately pleaded a cause of action using the cat's paw theory where the plaintiff alleged that the employer had credited the accusations of a prejudicial co-worker, Gray, "to the exclusion of all other evidence," and also had "specifically declin[ed] to examine contrary evidence tendered by" the plaintiff, allowing "Gray's accusations to form the sole basis for [the] decision to terminate" the plaintiff.  *Id.*; *see*

*also id.* (noting that Gray formed "the entire case" against plaintiff).  At the same time, *Vasquez* "emphasize[d] that such an approach should not be construed as holding an employer liable simply because it acts on information provided by a biased co-worker," and "[t]hus, an employer who, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of unlawful animus cannot, under this cat's paw theory, be held accountable for or said to have been motivated by the employee's animus."  *Id.* at 275 (quotation marks omitted).  These cat's paw "principles provide for liability where the employer was negligent because it acted at the agent's behest when it knew or should have known of the agent's discriminatory motivation." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019); *see also, e.g., Edwards v. Rochester Inst. of Tech.*, 794 F. App'x 65, 67 (2d Cir. 2019) (summary judgment finding no liability under cat's paw theory affirmed where the "evidence shows that [the discriminatory employee] did not have authority over [the plaintiff] when she was terminated," and that "[a]lthough [the employer] consulted with [the discriminatory employee] before terminating [plaintiff], [the employer] also spoke with four other [] employees" and found the "evidence was consistent"); *Jones v. Target Corp.*, 792 F. App'x 54, 56-57 (2d Cir. 2019) ("While an independent investigation does not necessarily insulate a defendant from liability, it does where … 'it results in an adverse action for reasons unrelated to the supervisor's original biased action.'") (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 420-22 (2011)); *compare Rotger v. Montefiore Med. Ctr.*, 15 Civ. 7783, 2019 WL 1429556, at *7 (S.D.N.Y. Mar. 29, 2019) (the "timeline of events as set forth in the record would allow a reasonable jury to conclude that the decision to terminate Rotger was made based solely on McLean's report of the event, before any corroborating statement was received").

The retaliation standard under NYCHRL is similar to that under Title VII, but, following 2005 revisions, there are several points of difference that warrant mention and require courts to "analyze NYCHRL claims separately and independently from any federal and state law claims."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

17

Section 8-107(7) of the NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate … in any manner against any person because such person has [] opposed any" unlawful discriminatory practice.  In order to make out a claim of retaliation under 8-107(7), a plaintiff need not meet the threshold of but-for cause applicable to federal claims, but must nonetheless demonstrate a causal connection between the protected act and the retaliatory conduct.  *See Mihalik*, 715 F.3d at 113 (must show that the "conduct is caused at least in part by discriminatory or retaliatory motives"); *Dudley v. New York City Hous. Auth.*, 12 Civ. 2771, 2014 WL 5003799, at *25 (S.D.N.Y. Sept. 30, 2014) ("Like Title VII, … the NYCHRL require[s] a causal connection between an adverse act and a protected activity to prove a retaliation claim."); *E.E.O.C. v. Bloomberg LP*, 967 F.Supp.2d 816, 862 (S.D.N.Y. 2013) ("Simply stating that the NYCHRL encompasses a broader a standard does not absolve Lancaster from putting forth evidence tending to show a causal connection…")

B. <u>Application</u>

    *1. Claims Subject to the Settlement Agreement*

        Defendants argue that "to the extent Plaintiff is attempting to allege discrete actions that occurred prior to March 27, 2017, those claims, under all statutes, are barred by the General Release he signed on that date to resolve his prior action filed on September 9, 2016." Def. Mem., ECF No. 37, at 6.  For example, Defendants contend that "to the extent Plaintiff is claiming that Jamison's July 2016 complaint against him … was a false complaint" amounting to a "discrete act of retaliation for Plaintiff's previous complaints of discrimination, this claim was asserted in the 2016 lawsuit, and settled and released with the General Release."  *Id.* at 8.

        While Defendants are correct that, under certain circumstances, an employee can waive discrimination claims through a settlement agreement, *see, e.g., Dash v. Bd. of Educ.*, 238 F.Supp.3d 375, 385 (E.D.N.Y. 2017), the settlement documents here simply do not bar the claim at issue.  Although the Complaint is saturated with details of discrimination that allegedly took

place prior to the effective date of the General Release (March 27, 2017), Plaintiff alleges only a single act of retaliation:  his termination on *July 29, 2017*.  Compl. at ¶¶ 71-92.[12]  The General Release precludes Dudley from bringing "any and all claims … which were or could have been asserted … up to [March 27, 2017]."  General Release at 1.  It goes without saying that Dudley could not have brought a claim for his July 29, 2017 retaliation until July 29, 2017.  Accordingly, I find that the settlement papers are not grounds for awarding summary judgment here.

   *2. Triable Issues of Fact as to Retaliation*

   Dudley contends that there is a triable issue of fact as to whether the "City was negligent in allowing Jamison's retaliatory intent … to achieve Dudley's termination."  Pl. Opp. Mem. at 7.  Defendants "failed," Dudley urges, "to heed" his denials of Jamison's claims, while conducting subpar investigations.  *Id.* at 7-8.  According to Dudley, the investigators——Real and Jote——failed to recognize inconsistencies in the statements and interviews of Lagno, McDaniel, and Jamison, and further failed to credit Dudley's contrary allegations.  *See id.* at 12-15.

   I am unpersuaded.  Defendants are entitled to summary judgment because, on the undisputed facts, they neither negligently relied *only* on Jamison's allegations to the exclusion of other corroborating evidence, nor even relied solely on the substance of Jamison's allegations for purposes of finding grounds for termination.  Indeed, as catalogued *supra*, DPR personnel *other than Jamison* filed their own complaints accusing Dudley of insubordinate conduct, and Dudley does not argue that those *other* employees used DPR higher-ups as a "cat's paw."  Accordingly, assuming *arguendo* that Jamison acted with retaliatory intent in alleging that Dudley engaged in misconduct, this intent cannot be imputed to Defendants.

   First, Defendants' investigation of Jamison's complaint was far from negligent.  Unlike in *Vasquez*——relied upon heavily by Dudley——where the employer relied on the claims

---

[12] *See also* Pl. Opp. Mem. at 3 ("Here, the adverse employment action suffered by Plaintiff was a termination.  Mr. Dudley's employment was terminated effectively on July 25, 2017.").

of Gray "to the exclusion of all other evidence" and "specifically declin[ed] to examine contrary evidence tendered by" the plaintiff, 835 F.3d at 273-74, Defendants here *extensively* investigated the July 12, 2016 incident through a number of neutral parties (and these investigations were, in turn, upheld on a number of appeals).  Defendants' investigations entailed, *inter alia*, interviews with Jamison, Dudley, two neutral eyewitnesses (Lagno and McDaniel); comparisons of witness interviews to written statements; and thorough written memorandums balancing the evidence and drawing the prudent conclusion that Dudley's wholly unsubstantiated version of events was not a credible one.  *See supra* section I.B.  Far from ignoring Jamison and Dudley's rocky relationship, Jote took note in her memorandum that Jamison had some "motives to fabricate her allegations," but chose to credit those allegations based not only on implausibilities in Dudley's recollection,[13] but also the corroborating testimony of not one but two unbiased eyewitnesses.  *See id.*  And this flows in to a critical fact:  Jote, Real, and the many other investigators (both in and out of DPR) with a hand in evaluating Jamison's complaint, relied on written and oral testimony from Lagno and McDaniel——neither of whom had any incentive to lie; both of whom had positive feelings toward Dudley and a positive relationship with Dudley——that discredited Dudley's story while supporting Jamison's.  Dudley maintains that "Jamison achieved … a decisive role" in his firing, Pl. Opp. Mem. at 7, but that is just not true.  Indeed, in several of Dudley's subsequent appeals (of which I count at least four), the reviewer specifically noted the import of both Lagno and McDaniel confirming Jamison's account.  *See, e.g.,* NYCOLR Dec. at 3 ("[DPR] submitted signed witness statements from other employees attesting to [Dudley's] inappropriate language

---

[13] Likewise, Real observed that Dudley falsely stated in his interview that he had a clean disciplinary record at DPR, when documentary evidence readily available to Real proved that not to be true.  *See* Real Memorandum at 2-4.  The record also makes clear that Dudley contradicted himself in explaining why he was present at the pool to begin with. Dudley told Real during an interview that he had "gone to the pool to rehab injuries that he had incurred in a vehicle accident," *id.* at 3, but testified at the arbitral hearing that he "went to meet his co-worker … to congratulate him on his promotion," Arbitrator Dec. at 6——this tension was noted by the arbitrator as further grounds to doubt the truth of Dudley's assertions.

and behavior"); Arbitrator Dec. at 8 ("This was the testimony of … most significantly, [] Ms. Lagno, who had no personal stake in the matter.  In addition, … [McDaniels] reported that the incident took place in the pool office in a written report and also during the interview with the EEO investigator.").[14]

   In sum, because the undisputed evidence demonstrates that Defendants did not negligently rely on Jamison's allegations to the exclusion of all other evidence, and instead shows that Defendants fastidiously investigated Jamison's complaint, Dudley has failed to create a triable issue of fact as to whether Defendants are liable under the "cat's paw" theory.[15]  While there is "need for caution about granting summary judgment to an employer in a discrimination case [if]… the merits turn on a dispute as to the employer's intent," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), what we have here is not a dispute as to intent, but as to whether a "non-negligent[] and [] good faith" investigation took place, *Vasquez*, 835 F.3d at 275.  It did.

---

[14] Dudley's insinuation that DPR unjustifiably ignored his complaints in favor of Jamison's is further belied by the evidence that Dudley's own complaints were thoroughly and separately investigated by DPR, DCAS, and external agencies, and that these investigations culminated in detailed memorandums explaining why Dudley's inconsistent allegations could not be substantiated.  *See supra* section I.C.

[15] Dudley goes to great lengths to point out what he deems "discrepancies" in testimony given by Jamison, Lagno, and McDaniel.  For one thing, I note again that Dudley's theory is that *Jamison*'s bias should be imputed, not that Lagno or McDaniel sought to retaliate against him——as such, even if there were meaningful discrepancies in Lagno and McDaniel's testimony, Defendants' reliance thereupon would not be actionable, as there would be no malice to impute.  Further, many of Dudley's so-called discrepancies are not really discrepancies at all, in several instances amounting to no more than Dudley taking issue with how the evidence was weighed.  For example, Dudley suggests that "pursuant to Jamison's account Dudley went to see her at the [pool] on July 12, 2016 because he was upset about a write-up that occurred at least 7 months ago," Pl. Opp. at 9, but Jamison never claimed Dudley specifically went to the pool to seek her out, only that a past incident involving a write-up explained the animosity between them.  Elsewhere, Dudley adds that Lagno did not see him nudge Jamison (although Lagno noted in her interview with Jote that her back was turned during part of the altercation and the nudge could have occurred then and also that Dudley may have bumped Jamison who then bumped into Lagno), but whether or not the nudging was proven, Lagno, McDaniel, and Jamison all confirmed that Dudley called Jamison a "nigger" repeatedly, and it was this offensive language that formed the basis for his later charge.  As Dudley himself acknowledged, DPR "has no tolerance for using names of such."  Dudley Tr. at 77:6-7.  In any case, as noted *supra*, Dudley's briefing sounds more in discontent with the investigators' conclusion that he was not credible, than in actual negligence.  *See, e.g.,* Pl. Opp. at 9 ("more credence should have been given to" Dudley); 10 ("Dudley always stayed firm in saying that Jamison's allegations were false").  Dudley misunderstands.  As has been recognized repeatedly, an "employer can … 'just get it wrong' without incurring liability," so long as it did not act negligently in its investigation, *Vasquez*, 835 F.3d 275; *see Toussaint v. NY Dialysis Servs., Inc.*, 230 F.Supp.3d 198, 218 (S.D.N.Y.) ("[T]he fact that Defendant may have incorrectly credited Warbington's … account of the incident does not give rise to a conclusion that its mistake was based on discriminatory animus."), *aff'd*, 706 F. App'x 44 (2d Cir. 2017).

There is a second fact that cleanly breaks the causal chain between Jamison's alleged retaliatory animus and Dudley's termination:  Dudley was also charged with a number of complaints of workplace insubordination by persons *other than Jamison*.  Neither party disputes that insubordination is grounds for termination.  *See Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("We have held generally that insubordination and conduct that disrupts the workplace are legitimate reasons for firing an employee.") (quotation marks omitted).  As described above, *see supra* section I.B.2, the PAO investigation headed by Real included within its scope a complaint from DPR employee Helaine Basher, which complaint included allegations from other personnel aside from Jamison, essentially stating that Dudley frequently failed to show up for work, failed to show up at his post, and otherwise disregarded instructions from supervisors on a number of occasions in late July 2016.  Dudley was found guilty of all these charges.  *See* DPR Dec. I.  And nowhere in Dudley's briefing (or elsewhere) does he accuse Basher of sharing Jamison's motive to retaliate.  Dudley makes a single passing assertion that "Real wholly failed to investigate the insubordination and time and attendance allegations," and "did nothing in furtherance" of this investigation.  *See* Pl. Opp. Mem. at 8.  But even if this were so—and the record indicates that it is not[16]—Dudley's "cat's paw" theory tries to impute Jamison's motive to Defendants; Dudley does not try to connect Basher's complaints with a retaliatory motive.  At most, Dudley suggests in his Complaint that terminating him for insubordination was pretextual because his termination in July 2017 came long after he alleged acted improperly in July 2016.  *See* Compl. at ¶ 79.  But the record makes clear that the investigations of Dudley's July 2016 conduct began immediately after Jamison made her complaint, that the investigation concluded in September 2016, and that the only reason charges were not brought until June 2017 was because Dudley was out of work

---

[16] *See* Real Memorandum at 2-3 (describing insubordination charges and noting that the complaining personnel "were interviewed by this office and verified that their statements to supervision were accurate"); *see id*. at 5 (reviewing, over the course of several paragraphs, the insubordination charges against Dudley).

on medical leave from September 2016 to June 2017.  *See supra* section I.B.3.  In sum, even if Jamison had retaliatory motive, and even if this retaliatory motive could be attributed to the City and DPR, other employees——none of whom Dudley claims was retaliating against him——made complaints that constituted separate justification for his dismissal.  Again, claims of retaliation are not won and lost on the basis of whether the employer is correct in its assessment of the facts, but on the basis of whether the employer was improperly motivated.  Dudley has failed as a matter of law to connect his firing with a retaliatory motive on the part of Defendants.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in full.  The Clerk is instructed to terminate the motion (ECF Nos. 34), and mark the case closed.

SO ORDERED.

Dated:  July 7, 2020                         _____/s/_____
           New York, New York                             ALVIN K. HELLERSTEIN
                                                                      United States District Judge